**Gary J. HILL, Appellant,**

v.

**The HERALD–POST PUBLISHING COMPANY, INC., Scripps Howard Company, Inc., and Arvel (Rod) Ponton, III, Appellees.**

No. 08–92–00418–CV.

Court of Appeals of Texas, El Paso.

Feb. 16, 1994.

Rehearing Denied April 28, 1994.

Michael R. "Mickey" Milligan, El Paso, for appellant.

Thomas E. Stanton, El Paso, Royal Furgeson, Kemp, Smith, Duncan & Hammond, El Paso, for appellees.

Before BARAJAS, C.J., and KOEHLER and STEPHEN F. PRESLAR, JJ.

## OPINION

KOEHLER, Justice.

In a suit brought by Appellant, an attorney, against a newspaper and another attorney for alleged libelous and slanderous articles and statements made about him, the trial court rendered a summary judgment in favor of both defendants on all causes of action pled against them. In eight points of error, Appellant asserts that genuine issues of material fact exist which make the granting of the summary judgment erroneous. We affirm in part and reverse and remand in part.

## FACTUAL BACKGROUND

Arvel (Rod) Ponton, III, an attorney and one of the Appellees herein, was employed by Jose Ruiz Contreras to represent him in connection with a federal charge of smuggling a large quantity of marijuana into the United States. In the course of pretrial

discovery in the criminal proceeding [1], Ponton filed a motion requiring the government to produce and disclose a large amount of potential evidence in the form of documents, statements, reports, photographs, and similar items relating to the charges against Contreras. He also filed a brief in support of the motion. In the motion and brief, Ponton, asserting that the information was material to his client's defense and as grounds for the far ranging discovery, alleged that Gary Hill, Appellant, Hill's investigator, Ivan Enriquez, and one David Houx were "paid confidential informants for the Drug Enforcement Administration." According to the brief, Hill's law office "would become knowledgeable about potential defendants before they were arrested by the Drug Enforcement Administration," thus allowing Enriquez to approach these defendants to inform them that they should hire Hill who "could obtain for them a lenient plea bargain because of Gary Hill's contacts with the Drug Enforcement Administration."

The brief additionally related that Contreras was a private investigator hired to investigate a fraudulent transaction by "a known DEA informant," David Houx, to sell a backhoe to two separate individuals. The brief stated that Houx's fraudulent scheme was discovered by Contreras and, in retaliation against him, Houx caused a Ryder truck containing 1000 pounds of marijuana to be parked in front of Contreras' house, that after he caused the marijuana to be seized by the police, Contreras consulted Hill about threats being made against him and Houx, and that unbeknownst to Contreras, Hill and Enriquez met with DEA Special Agent Ray Troy to "set into motion the events which resulted in the arrest of ... Contreras, on March 13, 1987."

After a reporter employed by the El Paso Herald–Post, a daily newspaper published by the Herald–Post Publishing Co., Inc. and owned by Scripps Howard Co., Inc. (collectively referred to as "Herald–Post"), another of the Appellees, learned of Ponton's allegations and obtained copies of the motion and brief, a number of articles were published from June 10 until August 13, 1987, about developments in the case against Contreras and the allegations made by him and Ponton in their discovery motion and brief. The first article was headlined, "Lawyer accused of being DEA snitch." Later articles indicated that Ponton had "backed away" from the allegation that Hill was a paid confidential informant of the DEA.[2]

Hill filed a defamation lawsuit against Ponton and the Herald–Post.[3] In the suit, he alleged that the Herald–Post by publishing a number of articles which continued to repeat Ponton's allegations about him after Ponton had backed off and had failed to prove those allegations, and that Ponton by making statements to a reporter and by delivering copies of a motion to dismiss and a brief in support of such motion to the reporter, libeled and slandered him. Both defendants filed motions for summary judgment, the Herald–Post on grounds that the published articles and statements were privileged under the First Amendment to the U.S. Constitution and Texas Civil Practice & Remedies Code, Section 73.002 and furthermore, were not defamatory as a matter of law, and Ponton on the grounds that the pleadings filed and statements made by him in connection with a judicial proceeding were absolutely privileged. Hill filed an opposition to the Herald–Post's motion but not to Ponton's motion. At the hearing on the motions, the trial court granted summary judgment in favor of all defendants on all claims, from which judgment Hill brought this appeal.

 In a summary judgment appeal, we are to determine whether the successful movants in the trial court carried their burden of

---

1. *The United States of America v. Jose Ruiz Contreras,* Cause No. EP–87–CR–71, In the United States District Court for the Western District of Texas, El Paso Division.

2. A copy of the full article appearing in the July 2, 1987 edition of the Herald–Post is included in an appendix to this opinion.

3. Apparently Hill does not subscribe to the philosophy ascribed to the late W.H. Fryer, a prominent El Paso criminal defense attorney of the 1940's and 1950's, who reportedly said in response to negative newspaper articles about him and his clients, "I don't care what they say about me as long as they spell my name right."

showing that there is no genuine issue of a material fact and that they are entitled to judgment as a matter of law. *Nixon v. Mr. Property Management Co., Inc.,* 690 S.W.2d 546, 548 (Tex.1985). In deciding whether or not there is a disputed fact issue precluding summary judgment, evidence favorable to the non-movant is to be taken as true, and in that connection, every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in his favor. *Nixon,* 690 S.W.2d at 548–49. Where the defendants are the movants, in order to prevail they each must by appropriate summary judgment evidence either (1) disprove at least one element of the plaintiff's theory of recovery or (2) plead and prove conclusively each essential element of an affirmative defense. *Bradley v. Quality Service Tank Lines,* 659 S.W.2d 33, 34 (Tex.1983); *Zep Mfg. Co. v. Harthcock,* 824 S.W.2d 654, 657 (Tex.App.—Dallas 1992, no writ); *Rayos v. Chrysler Credit Corp.,* 683 S.W.2d 546, 547 (Tex.App.—El Paso 1985, no writ). The basic issue presented to us in this case is, did Herald–Post and Ponton each establish as a matter of law that their alleged libelous and slanderous statements and actions were privileged and thus non-actionable?

▆▆▆ Under the common law and as statutorily defined, libel is a defamatory statement in written form, published to one or more third persons, that tends to injure a living person's reputation and as a result, exposes the person to public hatred, contempt or ridicule, or financial injury. *Renfro Drug Co. v. Lawson,* 138 Tex. 434, 160 S.W.2d 246, 249 (1942); TEX.CIV.PRAC. & REM. CODE ANN. § 73.001 (Vernon 1986). Slander is an orally communicated or published defamatory statement made to a third person, without legal excuse, which statement is either defamatory in itself or defamatory because it results in actual damages. *Glenn v. Gidel,* 496 S.W.2d 692, 697 (Tex.Civ.App.—Amarillo 1973, no writ).

▆▆▆ In a libel action, the trial court must determine as a matter of law, the threshold question of whether the words used were reasonably capable of a defamatory meaning. *Musser v. Smith Protective Services, Inc.,* 723 S.W.2d 653, 654 (Tex.1987); *Johnson v. Houston Post Co.,* 807 S.W.2d 613, 614 (Tex. App.—Houston [14th Dist.] 1991, writ denied). It should do this by construing the statement as a whole in light of surrounding circumstances judged upon how a person of ordinary intelligence would perceive the entire statement. *Musser,* 723 S.W.2d at 655. Only after the court determines that the statement is ambiguous or of doubtful import should the question be referred to the jury to determine the statement's meaning and the effect of its publication on an ordinary reader. *Id.* at 655.

▆▆▆ The publication by a newspaper of an article or item, which might otherwise be actionable, is privileged and not subject to a libel action, provided it is a fair, true, and impartial account of a judicial proceeding or a fair comment on a matter of public concern. TEX.CIV.PRAC. & REM.CODE ANN. § 73.002 (Vernon 1986). Furthermore, communications that are uttered or published by a person in the course of a judicial proceeding are absolutely privileged. *Zarate v. Cortinas,* 553 S.W.2d 652, 655 (Tex.Civ.App.—Corpus Christi 1977, no writ).

### CASE AGAINST THE HERALD–POST

In his first six points of error, Hill contends that there are genuine issues of material fact concerning his libel claims against the Herald–Post arising out of six different news items or articles, all but two of which appeared on different dates.

▆▆▆ Under his first point, Hill asserts that the headline of an article, but not the article itself, appearing in the June 10, 1987 issue of the Herald–Post, "Lawyer accused of being DEA snitch," was libelous because it was not fair, true, and impartial.[4] He bases this contention on the fact that the word *snitch* has several meanings, the first of which is as a transitive verb, "to snatch or steal; pilfer," and the second is as an intransitive verb, "to turn informer; tattle," and as a noun, "an

---

4. A copy of the full article appearing in the June 10, 1987 edition of the Herald–Post is included in an appendix to this opinion.

informer." It is Hill's conclusion that he was being accused by the Herald–Post of being a petty thief, thus limiting himself to that definition. There are several things wrong with this contention. The headline itself makes no mention of Hill. It is clear that "snitch" as used in the headline is a noun modified by DEA. It would make no sense to read the headline as stating that the lawyer was being accused of being a "DEA petty thief."

Moreover, because the headline is ambiguous, recourse must be made to the article to learn who the lawyer is that is accused of being a snitch. One must look to the gist of the article as a whole to determine if it would be, in the mind of the ordinary reader, a substantially correct report of Ponton's motion and brief, a fact that Hill does not contest. *McIlvain v. Jacobs,* 794 S.W.2d 14, 16 (Tex.1990); *Crites v. Mullins,* 697 S.W.2d 715, 717 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.). Although the article itself does not repeat the word "snitch," it becomes clear after reading the first two sentences of the article that Ponton in his motions was accusing Hill of being a paid informant of the Drug Enforcement Administration, not some unnamed attorney of being a "DEA petty thief." *Langston v. Eagle Printing Co.,* 797 S.W.2d 66, 69 (Tex.App.—Waco 1990, no writ). We thus conclude that the headline of the June 10 article was not in itself libelous and that the gist or thrust of the article was a substantially correct reporting of Ponton's motion and brief. The first point is overruled.

■ Points of Error Nos. Two, Three, Four, and Five complain that the Herald–Post was not entitled to summary judgment with regard to newspaper articles published on July 3, August 11, and August 12, 1987, as a genuine issue of material fact existed concerning the libel claim arising from those articles.[5] Hill argues that each of those articles failed to note, as an earlier article had allegedly stated, that Ponton's accusation had been "backed away from." He takes the position that the privilege is lost when the newspaper republishes a matter that is no longer of public concern. Under Tex.Civ. Prac. & Rem.Code Ann. § 73.002(a), the privilege accorded a newspaper does not extend to the republication of an item "if it is proved that the matter was republished *with actual malice* after it had ceased to be of public concern." [Emphasis added].[6]

Hill urges, without supporting authority, that "[a]n accusation which has been withdrawn is no longer of public concern." The Herald–Post, on the other hand, contends that the stage of the judicial proceeding is irrelevant. It cites *Wavell v. Caller–Times Publishing Co.,* 809 S.W.2d 633, 636 (Tex. App.—Corpus Christi 1991, writ denied), which found, under a First Amendment analysis rather than a statutory one, that certain articles relating to a relationship between an attorney and a woman charged with assaulting him, were "newsworthy as a matter of law." The holding in that case was based, in part, on language in *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 492, 95 S.Ct. 1029, 1045, 43 L.Ed.2d 328 (1975) that "[t]he commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions, however, are without question events of legitimate concern to the public and consequently fall within the responsibility of the press to report the operations of government." We conclude that so long as the article was a substantially fair, true, and impartial account of what had occurred in a judicial proceeding, it continues to be a matter of public concern, even if the pleadings which formed the basis of the article had been "backed off from." Although men-

5. Copies of the full articles appearing in the July 3, August 11 and August 12, 1987 editions of the Herald–Post are included in an appendix to this opinion.

6. Section 73.002 provides in relevant part:
 (a) The publication by a newspaper or other periodical of a matter covered by this section is privileged and is not a ground for a libel action. This privilege does not extend to the republication of a matter if it is proved that the matter was republished with actual malice after it had ceased to be of public concern.
 (b) This section applies to:
 (1) a fair, true, and impartial account of:
 (A) a judicial proceeding, unless the court has prohibited publication of a matter because in its judgment the interests of justice demand that the matter not be published[.]
 Tex.Civ.Prac. & Rem.Code Ann. § 73.002 (Vernon 1986).

tioned in several of the newspaper articles that Ponton had backed off or withdrawn his allegations that Hill was a paid D.E.A. informant, there is no summary judgment evidence that Ponton had in fact withdrawn or backed off those allegations.[7]

An examination of the four articles themselves indicates clearly that the charges and accusations made by Ponton against Hill in his motion and brief were mere allegations or accusations, which Hill vehemently denied. One of the articles (July 3) reported that Hill called Ponton a liar and threatened to file a grievance. Another article (August 11) related that Ponton in the Contreras trial referred to a third person as the paid DEA informer, thus presenting a different picture to the jury than he had in his motions. The same article also stated that Hill had "represented an accused co-conspirator, former Mexican customs agent Alfredo Huerta, who was convicted last month," a fact that Hill categorically denied in his affidavit in opposition to the motions for summary judgment. This presents an interesting question because the statement that Hill had "represented an accused co-conspirator ... who was convicted last month," standing alone, is not a slanderous statement even if false for the simple reason that it was and is a normal part of his business to represent criminal defendants. With reference to the definition of libel in Section 73.001, such a statement would in no way injure Hill's reputation. Does the fact that the statement was juxtaposed in the same article with a republication of Ponton's allegations against Hill change its nondefamatory character? We conclude that it did not because, first, the republication of the Ponton allegations was privileged, and

second, the implied finding of the trial court that the misstatement about Hill representing a co-conspirator was not libelous was correct. See *Musser*, 723 S.W.2d at 654.

The fourth article (August 12) reported the day's developments in the trial in which Hill testified as to his involvement with Contreras, and on cross-examination by Ponton, who tried to get him to admit working for the DEA, Hill denied that the relationship existed. Just the fact that the allegations had been made in a judicial proceeding would, under *Cox Broadcasting*, make it a matter of continuing public concern and interest.[8] Furthermore, as the articles show, Hill continued to be involved in some fashion, and as the August 12 article illustrates, Ponton had neither given up nor backed away from his allegations completely. Thus, even under Hill's theory, the allegations against him continued to be a matter of public concern and interest. Finally, the articles, when read in their entirety, appear to be substantially fair, true, and impartial accounts of an ongoing judicial proceeding, as observed from the standpoint of the Herald–Post reporters. *Lewis v. A.H. Belo Corp.*, 818 S.W.2d 856, 857 (Tex.App.—Fort Worth 1991, writ denied); *Crites*, 697 S.W.2d at 717. Although it is immaterial to a situation where the publication is about a matter of continuing public concern, we find no evidence of actual malice[9] on the part of the Herald–Post. The deposition of Joe Old, the Herald–Post reporter who wrote most of the articles, indicates strongly that he tried to be as fair, accurate, and objective as possible in reporting Ponton's allegations and Hill's assertions. Hill did respond in his affidavit in opposition to the motions, claiming that in a meeting

---

7. The fact that the Herald–Post reported that Ponton had backed off or withdrawn his allegations is a mere conclusion and is not summary judgment proof that such was the case.

8. Like it or not, once allegations have been made in a judicial proceeding against a private person, he becomes much the same as a public figure such as an office holder, with the result that a newspaper can continue to republish those allegations so long as the account is fair, true, and impartial. This differs from *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), a case relied on by Hill, where Gertz, a well-known Chicago civil rights

attorney, was accused by defendant's magazine of being a "Communist-fronter," "Marxist," and "Leninist." The magazine did not even purport to be reporting allegations made against Gertz in a judicial proceeding. The court held that he did not become a public figure merely because he represented criminal defendants in court.

9. Actual malice as used in libel cases means publication "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706 (1964).

with Old on June 9, 1987, Old "indicated" to Hill that he (Old) "was admitting that Ponton was unreliable and untruthful" and that he agreed that Ponton's "allegations were false and without factual basis." Hill's assertions which are pure opinion would not represent clear and convincing proof of actual malice sufficient to overcome the Herald–Post's summary judgment proof, as required by *Casso v. Brand,* 776 S.W.2d 551, 558 (Tex. 1989). The second, third, fourth, and fifth points are overruled.

Under his sixth point of error, Hill asserts that summary judgment was erroneous with regard to his libel claim based on an August 13, 1987 article published in the Herald–Post [10], wherein it was falsely related, under a headline that stated: *"Witness says she was threatened over testimony"* that Barbara Tovar, a defense witness in the Contreras case "testified that a lawyer and his investigator implied threats if she testified in the trial of Jose Contreras. Tovar said after she gave Contreras's attorney, Rod Ponton, a signed affidavit, lawyer Gary Hill and investigator Ivan Enriquez told her if she testified in the trial other persons 'would say certain things concerning criminal accusations.'"

In fact, Tovar testified at the trial in response to Ponton's direct examination that at a meeting with Hill and Enriquez, "The only thing they told me was to go ahead and tell the truth the way I felt the truth was." Ponton then asked the following questions about a subsequent meeting Tovar had with Enriquez alone at Hill's office:

Q. Did you have another meeting with Ivan Enriquez and Gary Hill?

A. Just with Ivan. I didn't see Gary Hill any more.

Q. Okay. And at that meeting—Where did that meeting take place?

A. In Ivan's office, at Gary Hill's offices.

Q. Who was present at that meeting?

A. Just Ivan and myself.

. . . . .

Q. After that meeting between you and Ivan Enriquez at Gary Hill's law office,

did I not communicate with you by telephone?

A. Yes, sir; you did.

Q. And what was it that you told me over the telephone in that conversation?

A. That *they* were going to implicate my husband on another drug deal. And I gave you a lineup of the way it was told to me that it had gone down.

Q. Did you tell me that you were now not wanting to come in and testify in this case?

A. Yes, sir; I did.

Q. And did you tell me that—Tell me why you told me that. Was it because of this meeting you had with Ivan Enriquez?

A. Yes, sir.

Q. After that meeting you had with Ivan Enriquez, did you feel intimidated?

A. Just a little bit. [Emphasis added].

Hill contends that since the article states that Hill threatened Tovar or implied threats if she testified, whereas she actually testified that in her meeting with Hill, he told her to tell the truth, it was not a fair, true, and impartial account of a judicial proceeding and therefore was not privileged under Section 73.002. The Herald–Post, on the other hand, argues that Tovar's use of the word "they" could be taken to mean that both Enriquez and Hill were making or implying a threat.

 Threatening to harm another by an unlawful act if the person serves as a witness is a third degree felony in Texas. TEX.PENAL CODE ANN. § 36.06 (Vernon Supp. 1994). A statement which falsely charges a person with the commission of a crime is considered to be libelous *per se. Christy v. Stauffer Publications, Inc.,* 437 S.W.2d 814, 815 (Tex.1969). Although Tovar's testimony is ambiguous as to who the "they" are she was referring to, the statement in August 13 article was unambiguous in stating that Hill and his investigator "implied threats" when they "told her if she testified in the trial other persons 'would say certain things con-

10. A copy of the full article appearing in the August 13, 1987 edition of the Herald–Post is included in an appendix to this opinion.

cerning criminal accusations.' " Where a statement is actionable *per se*, it would be error to allow a jury to determine whether the statement is defamatory. *Raymer v. Doubleday & Co., Inc.*, 615 F.2d 241, 246 (5th Cir.1980). We hold that the statement in question imputing a criminal act to Hill was not a substantially fair, true, and impartial account of the trial testimony and was thus not within the privilege afforded newspapers under Section 73.002. Hill's sixth point is sustained.

### CASE AGAINST PONTON

Hill's last two points of error contest the summary judgment granted in favor of Ponton. First, he insists that the privilege claimed by Ponton is unavailable with regard to the delivery of pleadings to a newspaper reporter. Similarly, under Point of Error No. Eight, Hill contends that the statement made by Ponton to a reporter is outside the umbrella of the judicial proceeding privilege.

In his petition, Hill alleged that on or about June 30, 1987, Ponton delivered copies of a "Motion to Dismiss Indictment ..." and "Brief in Support of Motion to Dismiss" to the offices of the Herald–Post and the El Paso Times, in which documents he made numerous allegations accusing Hill, among other things, "of being a government agent for years to create cases against Defendants, and violating his duty of confidentiality to his clients, and taking action in conflict of interest with his clients, which constitutes a violation of the ethics rules for attorneys for which the penalty is disbarment from the practice of law." Hill then alleges that the newspapers thereafter published and circulated articles which made reference to the two documents.[11]

█ Ponton sought a summary judgment on the sole basis that any publication made by Ponton regarding Hill was made or "uttered" in the course of his representation of a client and thus "absolutely privileged under Texas law." Hill made no response or objection to Ponton's motion in the trial court proceedings. Although the non-movant has

no burden to respond if the movant fails to conclusively establish the affirmative defense, *Gonzalez v. City of Harlingen*, 814 S.W.2d 109, 112 (Tex.App.—Corpus Christi 1991, writ denied); in the absence of a response, he is limited to raising for consideration on appeal the insufficiency of the summary judgment proof to support the specific grounds stated in the motion and he may not raise any other "genuine issue of material fact" as a ground for reversal. *Combs v. Fantastic Homes, Inc.*, 584 S.W.2d 340, 343 (Tex.Civ.App.—Dallas), writ ref'd n.r.e., 596 S.W.2d 502 (Tex.1979).

█ Communications and publications made in the due course of a judicial proceeding will not serve as the basis of a defamation action. *Reagan v. Guardian Life Ins. Co.*, 140 Tex. 105, 166 S.W.2d 909, 912 (1942). The immunity is absolute even though the statement is false and uttered or published with express malice. *Id.* 166 S.W.2d at 912; *James v. Brown*, 637 S.W.2d 914, 916 (Tex. 1982). The privilege extends to statements made by the judge, jurors, counsel, parties, or witnesses and attaches to all aspects of the proceedings. *Id.* at 916. This applies to an out-of-court communication, but the out-of-court communication in order to be privileged must bear some relationship to the proceeding and must be in furtherance of the attorney's representation. *Russell v. Clark*, 620 S.W.2d 865, 870 (Tex.Civ.App.—Dallas 1981, writ ref'd n.r.e.), which cited and quoted extensively from the Restatement (Second) of Torts, § 586, at 247 (1977), including the following statement on the basic law:

> An attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding.

In the 1981 Appendix to the Restatement, a note adds: "The absolute privilege does not extend to a press conference." Restatement

---

11. As was the case with the discovery motion and brief in support of that motion, the motion to dismiss and brief were filed of record in the case

of *United States of America v. Jose Ruiz Contreras* pending at the time in the United States District Court in El Paso.

(Second) of Torts, Appendix § 586, at 517 (1981). Hill does not claim, nor is there any summary judgment evidence, that Ponton called a press conference. It is alleged that he merely delivered copies of his motion and brief to the newspapers on one occasion, and on another occasion, in response to a telephone call from a reporter, stated:

I can prove my allegations about Gary Hill being a paid DEA informer. Everything alleged in my motions can be corroborated by documents or witnesses.

▮ In support of his contention that the absolute privilege does not extend to the delivery of pleadings to the newspapers or to statements made by Ponton to a reporter, he cites an Arizona case, *Green Acres Trust v. London*, 141 Ariz. 609, 688 P.2d 617 (1984), and a Texas opinion, *Levingston Shipbuilding Co. v. Inland West Corp.*, 688 S.W.2d 192 (Tex.App.—Beaumont 1985, writ ref'd n.r.e.). In *Green Acres*, the Arizona Supreme Court, citing both the Restatement (Second) of Torts § 586, and Prosser, Law of Torts (4th ed. 1971) § 114, at 781, held that attorneys have no privilege immunity "for the communications made by them to the newspaper reporter" where the communications were made prior to filing the action in a "press conference" contest. In *Green Acres*, a newspaper reporter attended a meeting between the defense attorneys and their clients and subsequently wrote an article based not only on a draft of the unfiled pleadings but on her conversations with the defense attorneys. 688 P.2d at 624. *Green Acres* is easily distinguishable in that the present case involves the mere delivery of documents previously filed in the Contreras criminal proceedings and available to the public.

In *Levingston Shipbuilding*, cited above, a shipbuilding company sued a competitor for disclosure of trade secrets, pleading for an amount "grossly in excess of any damages that could be proved" and "[i]mmediately after the lawsuit was filed, [the principal owner] instructed a long-time employee and one of his attorneys to give it to the news

media, which they did," causing harm to the defendant's reputation. 688 S.W.2d at 196. In the libel suit filed by the appellee competitor, judgment was rendered by the trial court for substantial damages based on the jury verdict. On appeal, the court found that appellant, by causing copies of the suit to be given to the news media, "stepped out of the umbrella of privilege." To reach this unique conclusion, the appellate court mistakenly relied on one Texas case, *De Mankowski v. Ship Channel Development Co.*, 300 S.W. 118 (Tex.Civ.App.—Galveston 1927, no writ). It was clear in *De Mankowski* that the defamation suit was not based on the appellant's pleadings in the prior suit but rather on appellant's slanderous statements made to various persons both prior to and subsequent to the filing of the suit. *De Mankowski*, 300 S.W. at 121–22. It appeared in *Levingston Shipbuilding* that the primary motive of the appellant in ordering copies of the suit delivered to the media was to obtain extensive publication with the intention of eliminating competition by harming the reputation of its competitor. 688 S.W.2d at 196. Although these facts seem to justify the affirmance of the jury verdict, the holding has no support in the case law and is a deviation from the general rule of absolute privilege. The harm resulting to the defamed party by delivering a copy of the suit or motion in a pending proceeding to the news media could demonstratively be no greater than it would be if the news media reporters got a tip from someone or found the pleadings on their own. For these reasons, we decline to follow the holding in *Levingston Shipbuilding* and instead, hold that under the facts of this case, the mere delivery of pleadings in pending litigation to members of the news media does not amount to a publication outside of the judicial proceedings, resulting in a waiver of the absolute privilege.[12]

▮ With reference to the statement allegedly made by Ponton to an El Paso Times reporter in response to an inquiry about Ponton's motions, we conclude that the statement bore a substantial relationship to the

---

12. Attorneys are subject to professional discipline if their actions deviate from the bounds of ethical conduct. *See* Texas Code of Professional Responsibility, Disciplinary Rule 7–107, Trial Publicity, which was in effect in 1987. Tex. Govt.Code Ann., T.2, Subt. G App., Art. 10, § 9 (Vernon 1988), *repealed by* Order of the Texas Supreme Court dated October 17, 1989.

criminal proceedings and was made in furtherance of his representation of his client. Ponton was merely affirming the allegations in his motion and brief and his belief that he could prove them, the response many if not most attorneys would make if queried by the news media about the allegations in a petition or an indictment.

Points of Error Nos. Seven and Eight are overruled.

Having overruled all of Hill's points of error except Point of Error No. Six which we have sustained, we affirm the summary judgment as to all defamation causes of action asserted by Hill against the Herald–Post and Ponton, with the exception of the cause of action against the Herald–Post based on the article appearing in the August 13, 1987 editions of its newspaper. As to the latter cause of action, we reverse the judgment of the trial court and remand to the court below for trial on the merits as to the amount of damages, if any, only. Costs of the appeal are to be borne two-thirds by Hill and one-third by the Herald–Post.

### APPENDIX

### El Paso Herald–Post

### Thursday, July 2, 1987
### LAWYER BACKS OFF IN SUIT

### DEA-informant allegation hearing gets postponed

**By Joe Old**

El Paso Herald Post

Attorney Arvel Rod Ponton appears to have backed away from the position that another El Paso attorney is a paid DEA informant.

The conflict between the two attorneys arose in the case of retired police officer Jose Contreras, 44, indicted on narcotics smuggling charges. In a hearing Wednesday, Ponton asked for a postponement of the trial.

U.S. District Judge Harry Lee Hudspeth was expected to rule today on whether to grant Ponton's motion for a delay in the trial.

Ponton, who filed an enormous packet of materials earlier this week, says he needs more time to research his motion to dismiss the charges against Contreras, whom he says was framed.

Contreras was charged in March after police discovered a rental truck with 1,000 pounds of marijuana in front of his home.

In court Wednesday and in documents filed earlier this week, Ponton appeared to have backed off allegations made a month ago that attorney Gary Hill was a "paid confidential informant" of the U.S. Drug Enforcement Administration.

He let stand allegations that Hill and his investigator are involved in a "symbiotic" and beneficial relationship with the Drug Enforcement Administration.

Ponton, whose attack in a hearing before Hudspeth Wednesday focused more on Hill's investigator, Ivan Enriquez, than on Hill, declined to comment on the apparent change in his position, saying he could not discuss pending litigation.

Hill accused Ponton of using "his privileged standing with that motion to attack me, because I have a lot of business and he has none, and he thinks that will get him some business." He said he plans to file a grievance with the state bar association.

In documents filed Tuesday, Ponton raised the possibility that Hill and Enriquez were behind a "complimentary" drug bust made in San Elizario for U.S. Attorney General Edwin Meese earlier this year.

Prosecutors denied allegations that Enriquez had received payments and favors from the federal drug agency.

During the "discovery" hearing Wednesday, Ponton asked that prosecutors surrender a variety of materials. Hudspeth granted some requests but said he did not see how other materials Ponton wanted could help Contreras.

Also Wednesday, private investigator Jesus "Chuy" Reyes, who Contreras worked with after retiring from the police force, said he will file a grievance against Ponton.

Reyes denied he ever attended a meeting that Ponton alleges occurred at El Paso headquarters of the Drug Enforcement Ad-

ministration in November 1986. Ponton claimed the meeting involved discussions on kidnapping Juarez drug lord Gilberto "Mophead" Ontiveros and other Mexican narcotics traffickers and delivering them to U.S. authorities for a bounty.

"I was never offered any money by the DEA," Reyes said. Reyes said that statement, as well as a misquote in the Herald–Post that he was a paid DEA informant—corrected the following day—had hurt his business, in Mexico.

El Paso Herald–Post

Wednesday, June 10, 1987

## LAWYER ACCUSED OF BEING DEA SNITCH

**By Joe Old**

El Paso Herald–Post

El Paso attorney Arvel "Rod" Ponton has accused a fellow defense attorney of being a paid informant of the Drug Enforcement Administration.

Ponton made the accusations against Gary Hill, as well as Hill's investigator, Ivan Enriquez, in motions filed in federal court Monday. Ponton is representing former El Paso police detective Jose Ruiz Contreras, who was charged with smuggling 1,000 pounds of marijuana into the United States in March.

The motions filed by Ponton state that Hill and Enriquez worked closely with a known DEA informant named David Houx, and with a DEA agent named Ray Troy, in a "symbiotic relationship" that enabled Hill's law firm to gain advance information on drug cases and thereby to gain clients.

In exchange for their help, Hill's clients got special deals and "lenient" sentences for plea bargaining, Ponton alleged.

A further allegation is that Enriquez and private investigator Jesus "Chuy" Reyes, both alleged to be "paid confidential informants" of the DEA, met with DEA Agent Ernesto Perez, chief of the El Paso office, to arrange the kidnapping of Juarez drug lord Gilberto "Mophead" Ontiveros and turn him over to El Paso DEA agents for $250,000.

Hill categorically denied Ponton's charges and said he was exploring whether he could take legal action against Ponton for "totally and patently false" and "malicious" allegations.

Because the allegations were made in motions filed in federal court, Ponton may be immune from prosecution for slander, Hill said. He added, however, that if Ponton had repeated the allegations to people outside the court setting, he could possibly be prosecuted or he might be subject to disciplinary action by the bar.

Phil Jordan, special agent in charge of the Dallas regional office of the DEA, said he was not aware of any defense attorneys in the Dallas region cooperating as informants with the DEA. He dismissed the allegation of a proposed bounty of $250,000 for Ontiveros as "ludicrous."

Among Ponton's numerous charges were that his client, Contreras, was set up by Houx, who "arranged for the transport into the United States of 1,000 pounds of marijuana" seized in a truck in front of Contreras's home March 11.

According to Ponton, "parties in Juarez" contacted Contreras, who was working as a private investigator with Reyes after retiring from the El Paso Police Department last fall, and attempted to learn from him what happened to the marijuana.

Contreras told them it had been confiscated by the police and that Houx was "the confidential informant in the case," Ponton alleged.

The parties—unnamed in Ponton's motions but identified in hearings in March as Ontiveros and another accused Juarez narcotics trafficker, Rafael Aguilar—threatened Contreras and Houx, Ponton said.

At that point, Contreras called Hill—allegedly because Hill was Houx's attorney—trying to get Hill to warn Houx and seeking Hill's services as an attorney, Ponton alleged On Tuesday, Hill denied ever representing Houx, although he recalled Contreras's call, which occurred sometime before Contreras's arrest.

Hill said he called the DEA to report Contreras's claims, saying that any attorney would be ethically and legally bound to report information about a planned crime. Such information would not be subject to the attorney-client privilege, even if he were Contreras's lawyer, Hill said.

Hill said that Contreras told him the owners of the marijuana "knew that Houx was the snitch and that he (Contreras) was supposed to meet Houx at 6 p.m. They had shown him $50,000—with another $50,000 to come—to kill Houx."

At his bond hearing in March, prosecutors charged that Contreras was summoned to the federal penitentiary in Juarez where Ontiveos and Aguilar are now incarcerated to account for the disappearance of the marijuana.

Houx, of 5312 Santa Teresa Drive, who worked for Tom Growney Equipment Inc., declined to be interviewed.

The Ponton briefs related a story in which Houx allegedly swindled two Mexican businessmen by selling them the same backhoe for $16,000 each last year, then filed a false report that it had been stolen. At the time, one of the businessmen hired Contreras to get their money back.

Ponton could not be reached for comment.

**El Paso Herald–Post**

**Friday, July 3, 1987**

**TANGLED IN RED TAPE**

**Attorney failed to apply or to take test to practice in El Paso**

**By Joe Old**

El Paso Herald–Post

Attorney Arvel Rod Ponton has been practicing law in federal court here without being properly admitted to practice.

U.S. District Judge Harry Lee Hudspeth showed his displeasure at Ponton Thursday during "docket call," when the attorneys come to court to discuss the status of their cases.

According to local rules, attorneys must apply in order to practice, take a simple written test on the law and procedures, be willing to appear before a committee from the local bar and have letters of recommendation from local lawyers. Afterward, they are sworn in by a federal judge in the Western District of Texas.

Ponton, who was approved to practice in the Northern District of Texas, never completed the application here, but has appeared in court several times as the sole attorney in cases.

Records in the district clerk's office show Ponton filed an application to practice in the Western District in March 1986, but never took the test.

He is currently representing former El Paso police officer Jose Contreras, 44, charged with marijuana smuggling.

The case has generated controversy because Ponton has submitted court documents alleging that another El Paso attorney, Gary Hill, and his investigator Ivan Enriquez, are informants of the U.S. Drug Enforcement Administration.

Both vehemently deny the allegations.

The issue of Ponton's standing in court surfaced Thursday, after the district clerk's office brought it to the attention of Hudspeth the day before. At 8:15 a.m. Thursday, Ponton filed a motion seeking permission to appear in this one case.

When the judge called for the status of the Contreras case, Ponton rose and asked for a hearing on a continuance he filed Wednesday. On Wednesday, the judge criticized Ponton for filing the motions late and said he could legally deny them because they weren't filed on a timely basis.

Hudspeth said that later he would give Ponton a hearing on the motion to appear in the Contreras case.

"I'm not going to pre-judge whether I'll grant it," he added, "but I'll tell you that I'm very unhappy with the fact that you represented yourself as being eligible to represent this man when you weren't."

He then granted a motion to sever Ponton's case from that of Contreras' co-defen-

dant and agreed to move on with the co-defendant's trial on July 13.

Ponton also appears before U.S. District Judge Lucius Bunton of Midland–Odessa who hears cases for the Western District in Texas. Hudspeth said Bunton was aware of the situation.

### El Paso Herald–Post

### Tuesday, August 11, 1987
### LAWYER SET TO TESTIFY TODAY IN EX–POLICEMAN'S SMUGGLING TRIAL

By Frank Ahlgren, Jr.

El Paso Herald–Post

An El Paso lawyer was expected to testify today in the drug smuggling trial of a retired El Paso policeman.

Jose Luis Contreras, 44, is accused of conspiracy to smuggle and transport marijuana for distribution and also with threatening a witness in the case against him.

Attorney Rod Ponton represents Contreras along with attorney Tony Chavez. Lawyer Gary Hill represented an accused co-conspirator, former Mexican customs agent Alfredo Huerta, who was convicted last month.

Last June Ponton filed motions in U.S. District Court accusing Hill and his investigator, Ivan Enriquez, of being Drug Enforcement Administration informers.

Hill was set to testify today.

Contreras was arrested in March along with fellow defendants after the DEA and police followed a truckload of marijuana across the border from Juarez and saw it parked in front of Contreras's home.

Contreras retired from the Police Department in the fall of 1986 and became a private investigator. Assistant U.S. Attorney Joe Galenski said in an opening statement Monday that Contreras was used by a smuggling ring to spot any law enforcement agents who might be around when the drug transaction was made.

But Ponton presented to the jury a different picture. He said the paid informer—not Hill or Enriquez—was in the vehicle sales business. The informer had sold the same tractor to two different Mexican businessmen, taken their money but failed to deliver the tractor to either, Ponton said. The businessmen hired Contreras to get the tractor or the money for them, said Ponton. He said the informer finally delivered the tractor to one but needed a way to settle the other debt. ·

Ponton said the DEA paid the informer $1,606—the amount owed the other businessman—to set up the drug smuggling caper.

### El Paso Herald–Post

### Wednesday, August 12, 1987
### LAWYER TELLS OF PLAN TO KILL INVESTIGATOR

By Frank Ahlgren, Jr.

El Paso Herald–Post

El Paso lawyer Gary Hill took the witness stand today in the narcotics smuggling trial of Jose Contreras.

Hill said Contreras telephoned his office last March 13 to warn Hill's investigator, Ivan Enriquez, that some "people from Mexico" wanted to kill David Houx, a Drug Enforcement Administration informer. Previous testimony told how Houx had set up a 1,000–pound marijuana delivery to El Paso, so the DEA could infiltrate a smuggling ring.

Contreras, a 44–year–old retired El Paso policeman, was charged in connection with the March 11 smuggling operation.

After police seized the marijuana but before anyone was arrested, the smugglers figured out that Houx had contacted authorities and offered Contreras $100,000 to kill him, Hill said Contreras told him on the phone. Contreras called Hill's office because Enriquez and Houx were friends, he said.

Enriquez testified he later talked with Contreras, who said he wouldn't go through with it.

Contreras's attorney, Rod Ponton, cross-examined Hill trying to establish that he and Enriquez worked for the DEA. Hill said he

didn't, nor did Enriquez to his knowledge. Last spring Ponton filed a complaint in federal court accusing the two of being informers, but later withdrew the charge.

### El Paso Herald–Post

### Thursday, August 13, 1987
### EL PASO TODAY

### Northeast woman raped on trip to San Antonio

A 19–year–old Northeast woman was raped earlier this week near Sierra Blanca, Sheriff's Capt. Paco Aguirre said.

The woman was driving to San Antonio Monday when she ran out of gas about 45 miles west of the Sierra Blanca checkpoint. An 18–year–old woman was traveling with her.

A truck driver, who stopped and offered to take the women to a gas station, raped the 19–year–old while the 18–year–old slept, Aguirre said.

According to the victim, the truck driver parked on the side of the road, forced her to get off the truck and attacked her while several cars drove by.

The man is described as being between 35 and 40 years old, 5 foot, 11 inches tall, 130 to 140 pounds, with curly blonde hair and blue-green eyes.

### Witness says she was treatened over testimony

The trial of a former police officer accused of narcotics smuggling continued in federal court today.

Defense witness Barbara Tovar, whose husband has been convicted on cocaine smuggling charges, testified that a lawyer and his investigator implied threats if she testified in the trial of Jose Contreras, 44.

Tovar said after she gave Contreras's attorney, Rod Ponton, a signed affidavit, lawyer Gary Hill and investigator Ivan Enriquez told her if she testified in the trial other persons "would say certain things concerning criminal accusations."

She said Ponton told her if she signed the affidavit he might be able to help her step-son, currently serving prison time.

### El Paso man indicted on robbery charges

A grand jury has indicted an 18–year–old man on two charges of aggravated robbery.

Nabor Gutierrez Moran, who was arrested and charged with five separate robberies, was indicted for the July 21 hold up at Novo's Groceries, 6801 Alameda Ave., and the July 22 robbery at Feder's Jewelers, 9350 Dyer St.

Moran, a member of a South El Paso gang, also is suspected of having robbed the McDonald's restaurant at 5305 E. Paisano Drive, police said. He was booked into the County Jail on July 30.

### Probe begins on alleged cruelty at animal shelter

A specially appointed committee today begins a month-long investigation into charges of cruelty at the El Paso animal shelter.

The meeting was set for 11:30 a.m. at the City–County Health District Office. The investigation team was appointed last week by Dr. Laurance Nickey, health director, after a television report about conditions at the dog pound sparked a barrage of charges between Ruben Dovali, supervisor with Animal Regulation, and County Commissioner Charles Hooten.

The KTSM–TV, Channel 9, news report showed dead animals in cages and inside a large walk-in refrigerator and alleged unsanitary and inhumane conditions exist.

☐ **City Editor/Karen Brehm, call 546–6340**